ACCEPTED
15-25-00034-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/10/2025 8:19 AM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00034-CV

# In the Court of Appeals
# for the Fifteenth Judicial District

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/10/2025 8:19:47 AM
CHRISTOPHER A. PRINE
Clerk

THE STATE OF TEXAS,

*Appellant,*

*v.*

ALEXANDRA ALVAREZ, JOSHUA LAFOUNTAIN,
CHRISTINE ELLIS, DDS,

*Appellees.*

On Appeal from the
459th Judicial District Court, Travis County

## BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney
General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

AMY SNOW HILTON
Chief, Healthcare Program
Enforcement Division

BRIAN VANDERZANDEN
Texas State Bar No. 24081557
Assistant Attorney General
Healthcare Program Enforcement
Division

Counsel for Appellant

ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

Appellant's Counsel:     Ken Paxton
Brent Webster
Ralph Molina
Austin Kinghorn
Amy Snow Hilton
Lynne Kurtz-Citrin

Brian VanderZanden (lead counsel)
Tel. No.: (512) 936-9929
Email: Brian.Vanderzanden@oag.texas.gov

Office of the Attorney General of Texas
P.O. Box 12548, MC 056-1
Austin, Texas 78711-2548

Appellees:     Alexandra Alvarez, Joshua LaFountain,
Christine Ellis, DDS

Appellees' Counsel:     Charles S. Siegel
Caitlyn E. Silhan
Waters & Kraus, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
Tel. No.: (214) 357-6244
Email: csiegel@waterskraus.com
Email: csilhan@waterskraus.com

James R. Moriarty
Law Offices of James R. Moriarty
4119 Montrose Boulevard, Suite 250
Houston, Texas 77006
Tel. No.: (713) 528-0700
Email: jim@moriarty.com

James "Rusty" Tucker
Law Offices of James R. Tucker, P.C.

6414 Del Norte Lane
Dallas, Texas 75225
Tel. No.: (214) 505-0097
Email: rusty@rustytuckerlaw.com

# TABLE OF CONTENTS

Identity of Parties and Counsel ............................................................... i

Table of Contents........................................................................ iii

Index of Authorities ................................................................... vii

References ...............................................................................xii

Statement of the Case ...............................................................1

Statement Regarding Oral Argument ...........................................1

Statement of Jurisdiction ............................................................1

Issues Presented.........................................................................2

Introduction .............................................................................3

Statement of Facts .....................................................................4

I.     Legal background.............................................................. 4

II.    Factual Background ..........................................................5

    A.    The State's investigation of Xerox (2010–2011) ...................5

    B.    Media Investigation (2011–2012) ....................................7

    C.    *Qui tam* actions naming Xerox (2012) ..............................7

    D.    *State v. Xerox* (2014) .................................................... 8

III.   Appellees' Motion for Relators' Share......................................... 8

Summary of the Argument............................................................ 9

Standard of Review .....................................................................10

Argument....................................................................................11

I.  Appellees Have Not Pled a Valid Cause of Action Sufficient to Waive Sovereign Immunity.................................................................... 11

    A.  There is No Cause of Action. ................................................. 11

    B.  There is No Clear and Unambiguous Waiver of Sovereign Immunity. ................................................................................12

II.  The TMFPA's Public Disclosure Bar Prohibits Appellees' Claims Since Their *Qui Tam* Actions Were Based on Earlier Public Disclosures ........................ 15

    A.  Xerox's Fraud Was Publicly Disclosed Before Appellees Filed Their *Qui Tam* Petitions .................................................16

        1.  There were at least eleven earlier public disclosures that disclosed Xerox's fraudulent conduct .................................... 20

            (a)  May 13, 2011: WFAA article ....................................... 20

            (b)  June 19, 2011: WFAA broadcast ................................. 20

            (c)  July 5, 2011: Letter from the U.S. Department of Health and Human Services to Texas HHSC Executive Commissioner ........................................... 20

            (d)  August 25, 2011: WFAA website article ...................... 20

            (e)  August 30, 2011: HHSC news release .......................... 20

            (f)  September 1, 2011: Columbia Journalism Review article. ...................................................................... 20

            (g)  November 11, 2011: WFAA broadcast ......................... 20

            (h)  December 16, 2011: WFAA broadcast .......................... 20

            (i)  December 27, 2011: WFAA website article .................. 20

            (j)  January 24, 2012: Texas legislative hearing .................. 20

            (k)  January 25, 2012: texaswatchdog.org article ................ 20

2. The Appellees' allegations were "based on" the allegations in the public disclosures. ..........................................27

    a. Alvarez's allegations had been publicly disclosed......... 20

    b. LaFountain's allegations had been publicly disclosed .. 20

    c. Ellis's allegations had been publicly disclosed ...............31

B. None of the Appellees were Original Sources ....................................33

    1. LaFountain was not an original source ....................................35

    2. Ellis was not an original source...............................................37

III. LaFountain and Ellis are Barred by the TMFPA'S First-to-File Provision. 43

A. The First-to-File Bar Prohibits Later Filed *Qui Tam* Actions That Allege the Same Underlying Facts. ..................................................43

B. LaFountain Alleged the Same Underlying Facts of Xerox's Fraud as Alvarez. ...................................................................................45

C. Ellis Alleged the Same Underlying Facts of Xerox's Fraud as Alvarez and LaFountain......................................................................47

D. There is no Exception to the First-to-File Bar for Sharing Agreements. ...................................................................................... 48

IV. The TMFPA Does Not Authorize Awarding Interest Against the State. ... 49

A. When a Statute Controls, its Remedies are Exclusive ........................50

B. The TMFPA Does Not Provide for an Interest Award Against the State to Relators in this Matter ................................................................52

V. At Most, Appellees are Entitled to No More Than Seven Percent of the Proceeds of the *State v. Xerox* award. ..........................................54

A. Appellees Did Not Provide Significant Information. .........................56

B. Appellees Played No Role in Advancing *State v. Xerox* to Litigation. 57

Prayer ......................................................................................................59

Certificate of Compliance ...................................................................... 60

Proof of Service ..................................................................................... 61

# INDEX OF AUTHORITIES

**Cases**                                                           **Page**

*Abbott v. G.G.E.*, 463 S.W.3d 633 (Tex. App.—Austin 2015, pet. denied) ....... 50, 52

*Bell v. Low Income Women of Texas*, 95 S.W.3d 253 (Tex. 2002) ............................. 4

*C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315 (Tex. 1994) ........................ 50

*Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535 (Tex. 1981) ........................... 53

*Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549* (Tex. 1985) .................... 50

*City of Austin v. L.S. Ranch, Ltd.*, 970 S.W.2d 750 (Tex. App.—Austin 1998, no pet.) ................................................................................................................. 13

*City of Dallas v. Wright*, 36 S.W.2d 973 (Tex. 1931) .............................................. 51

*Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540 (Tex. 2003) ....................... 14

*Dingle v. Bioport Corp.*, 388 F.3d 209 (6th Cir. 2004) ..................................... 19, 20

*Dreyer v. Greene*, 871 S.W.2d 697 (Tex. 1993) ..................................................... 35

*Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447 (5th Cir. 1995) .............. 19, 54

*Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652 (Tex. 1990) ...... 12

*Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003) ..................................................... 42

*Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35 (Tex. 2020) ........................ 11

*In re Ament*, 890 S.W.2d 39 (Tex. 1994) ......................................................... 50, 52

*In re Dallas County*, 697 S.W.3d 142 (Tex. 2024) (orig. proceeding) ...................... 11

*In re Gilead Scis., Inc.*, No. 06-21-00030-CV, 2021 WL 4466006 (Tex. App.—Texarkana Sept. 30, 2021, orig. proceeding) ..................................................... 44

*In re Xerox Corp.*, 555 S.W.3d 518 (Tex. 2018) ................................................... 4, 52

*Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556 (Tex. 2014) ................................. 10

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998) ..................................................................................................................50

*Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282 (5th Cir. 2012) ............................... 40

*Loftin v. Lee*, 341 S.W.3d 352 (Tex. 2011) ...........................................................35

*Malouf v. State ex rels. Ellis*, 694 S.W.3d 712 (Tex. 2024) ............................... 41, 42

*Merena v. Smithkline Beecham Corp.*, 205 F.3d 97 (3d Cir. 2000) ..........42, 44, 54, 55

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629 (Tex. 2012) ...............14

*Nazari v. State*, 497 S.W.3d 169 (Tex. App.—Austin 2016) .................................. 4

*Patriot Contracting, LLC v. Shelter Prods. Inc.*, 650 S.W.3d 627 (Tex. App.—Houston [1st Dist.] 2021, pet. denied) ...............................................................51

*Prather v. AT&T, Inc.*, 847 F.3d 1097 (9th Cir. 2017)....................................... 38, 39

*Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723 (Tex. App.—Houston [1st Dist.] 2000, pet. denied)...............................................................................13

*Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007)....................................... 41, 42

*State v. Ellis*, 681 S.W.3d 501 (Tex. App.—Austin 2023, no pet.) ................9, 11, 44

*State v. Heal*, 917 S.W.2d 6 (Tex. 1996)................................................................. 11

*State v. Nazari*, 561 S.W.3d 495 (Tex. 2018) ........................................................52

*Stein v. Kaiser Found. Health Plan, Inc.*, No. 22-15862, 2024 WL 4784915 (9th Cir. Nov. 14, 2024) ................................................................................................43

*Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583 (Tex. 2001) ...................... 13

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217 (Tex. 2004) .................13

*Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636 (Tex. 1999) ......................................13

*Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39 (Tex. 2014) ...............................53

*United States ex rel. Advocates for Basic Legal Equality, Inc. v. United States Bank, N.A.*, 816 F.3d 428 (6th Cir. 2016) ....................................................................19

*United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699 (8th Cir. 1995) ........37

*United States ex rel. Black v. Health & Hosp. Corp. of Marion Cnty.*, 494 F. App'x 285 (4th Cir. 2012) .........................................................................................................18

*United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371 (5th Cir. 2009) .......................................................................................... 44, 45, 46, 48

*United States ex rel. Burke v. St. Jude Med.*, Inc., No. CV 16-3611-SAG, 2021 WL 6135202 (D. Md. Dec. 29, 2021) ...................................................................... 57, 58

*United States ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717 (6th Cir. 1999) .................18

*United States ex rel. Denis v. Medco Health Sols., Inc.*, 777 F. App'x 30 (3d Cir. 2019) ...............................................................................................................34

*United States ex rel. Dhawan v. N.Y. Med. Coll.*, 252 F.3d 118 (2d Cir. 2001) .........35

*United States ex rel. Fine v. Chevron, U.S.A.*, 72 F.3d 740 (9th Cir. 1995).............. 40

*United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015) ................ ........................................................................................ 44, 46, 48, 49

*United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836 (6th Cir. 2020) ...................................................................................................19, 20, 28, 33

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011) ........17

*United States ex rel. LaCorte v. Wagner*, 185 F.3d 188 (4th Cir. 1999).....................15

*United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346 (5th Cir. 2003) .........................................................................................................38

*United States ex rel. Lam v. Tenet Healthcare Corp.*, 287 F. App'x 396 (5th Cir. 2008) .........................................................................................................38

*United States ex rel. Lockey v. City of Dallas*, 576 F. App'x 431 (5th Cir. 2014) ...... 42

*United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516 (6th Cir. 2020).................17

*United States ex rel. Merena v. Smithkline Beecham Corp.*, 114 F. Supp. 2d 352 (E.D. Pa. 2000) ........................................................................................ 55, 56

*United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805 (11th Cir. 2015) ...........34

*United States ex. rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503 (6th Cir. 2008).18, 20, 21

*United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021)........ *passim*

*United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168 (5th Cir. 2004) ............................................................................17, 34, 36

*United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269 (5th Cir. 2021) ..............17

*United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201 (1st Cir. 2016)........................................................................................ 18, 19

*United States v. AthenaHealth, Inc.*, No. CV 17-12125-NMG, 2022 WL 658654 (D. Mass. Mar. 3, 2022) ........................................................................48, 49

*United States v. L-3 Communications EOTech, Inc.*, 921 F.3d 11 (2d Cir. 2019) .......15

*United States v. Millenium Labs., Inc.*, 923 F.3d 240 (1st Cir. 2019) ...................... 44

*United States v. Planned Parenthood of Houston*, 570 F. App'x. 386 (5th Cir. 2014) 44

*United States v. Wegeler*, 941 F.3d 665 (3d Cir. 2019)............................................15

*Univ. of Tex. at El Paso v. Herrera*, 322 S.W.3d 192 (Tex. 2010) ...........................13

*Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412 (9th Cir. 1992)................ 42

*Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692 (Tex. 2003) ......................13, 14

**Statutes**

31 U.S.C. § 3730(d)(1) ................................................................54, 55, 57

42 U.S.C. § 1396 ................................................................................ 4

Tex. Civ. Prac. & Rem. Code § 51.012 .................................................................1

Tex. Gov't Code § 531.101 ................................................................. 40

x

Tex. Gov't Code § 531.102(a) ................................................................... 40, 41

Tex. Gov't Code § 22.220(d) ...................................................................... 1, 3

Tex. Gov't Code § 311.016(5) ......................................................................16

Tex. Gov't Code § 311.034 ...........................................................................52

Tex. Hum. Res. Code § 36.001 .....................................................................xi

Tex. Hum. Res. Code § 36.051.....................................................................12

Tex. Hum. Res. Code § 36.104(a) ..................................................................5

Tex. Hum. Res. Code § 36.106 ....................................................10, 43, 44, 48

Tex. Hum. Res. Code § 36.109 ....................................................................14

Tex. Hum. Res. Code § 36.109(a) .........................................................5, 12, 14

Tex. Hum. Res. Code § 36.110 (West 2011) ........................................ *passim*

Tex. Hum. Res. Code § 36.113 (West 2011) ........................................ *passim*

Tex. Hum. Res. Code § 36.116........................................................... 10, 14

Tex. Hum. Res. Code § 36.101................................................................ 4, 12

**Rules**

Tex. R. App. P. 9.4(e) .................................................................................. 60

Tex. R. App. P. 9.4(i)................................................................................... 60

Tex. R. App. P. 9.4(i)(1)............................................................................... 60

"C.R.____" cites the Clerk's Record.

"R.R.____" cites the Reporter's Record.

"TMFPA" refers to Tex. Hum. Res. Code § 36.001, *et seq.*, which was formerly known as the Texas Medicaid Fraud Prevention Act. As of September 1, 2023, the TMFPA was amended and is now known as the Texas Health Care Program Fraud Prevention Act (THFPA). All events relevant to this action occurred before September 1, 2023, so this appellant's brief refers to the statute as the TMFPA.

"Xerox" refers to Xerox Corporation and its affiliated corporate entities, Xerox State Healthcare, LLC and Affiliated Computer Services Healthcare LLC (ACS). During the relevant time, Xerox served as the State's contractor, administering the Texas Medicaid prior authorization requirement for orthodontic benefits. C.R.346.

## STATEMENT OF THE CASE

| | |
|---|---|
| Nature of the Case: | This TMFPA matter is based on a *Joint Motion for Determination of Relators' Share and For Expenses, Attorneys' Fees, and Costs Pursuant to TMFPA § 36.110*; and on a *Renewed Motion for Determination of Relators' Share Pursuant to TMFPA § 36.110*. |
| Trial Court: | 459th District Court, Travis County, the Honorable Maya Guerra Gamble, presiding. |
| Course of Proceedings: | Appellees filed a *Joint Motion* and *Renewed Motion* seeking an award of a relator share under the TMFPA. C.R.3348. The State responded and moved for summary judgment. C.R.3831. Appellees replied. C.R.7623. After a hearing, the trial court issued an *Amended Final Judgment*. C.R.9534. |
| Trial Court Disposition: | The *Amended Final Judgment* awarded a relators' share of $37,160,865.00 plus $11,044,503.70 in prejudgment interest and post-judgment interest at the rate of 7.75%. C.R.9534. |

## STATEMENT REGARDING ORAL ARGUMENT

This Court should grant oral argument because this case raises significant issues of first impression regarding the TMFPA.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to review the final judgment pursuant to Tex. Civ. Prac. & Rem. Code § 51.012 and Tex. Gov't Code § 22.220(d).

# ISSUES PRESENTED

The issues presented are:

1. Whether Appellees have pled a valid cause of action sufficient to waive sovereign immunity.

2. Whether the TMFPA's public disclosure bar requires dismissal of Appellees' request for relators' share when their *qui tam* suits were based on publicly available information.

3. Whether the TMFPA's first-to-file bar precludes Appellees LaFountain and Ellis from receiving relators' shares.

4. Whether the TMFPA authorizes the trial court to award interest against the State.

5. Even if Appellees' requests for a relators' share were not otherwise barred, whether any award is limited to a maximum of 7%.

## INTRODUCTION

This appeal stems from the resolution of the State's investigation and prosecution of one of the largest suspected fraud schemes in Texas Medicaid's history. Xerox contracted with Texas Medicaid to review documents and patient information submitted with prior authorization ("PA") requests for orthodontic services and approve or deny those requests in accordance with Medicaid requirements. C.R.3841. Following investigative actions, Texas sued Xerox, contending that it failed to appropriately review PA requests, which resulted in Texas Medicaid paying hundreds of millions of dollars in payments for medically unnecessary orthodontia. C.R.6734; *State v. Xerox*, No. D-1-GV-14-000581 (53rd Judicial District Court, Travis County, Texas). Xerox ultimately agreed to pay the State $236 million to resolve the lawsuit. C.R.3349.

Years later, another trial court awarded over $45 million to three individuals who filed *qui tam* suits after the media and State had already exposed Xerox's fraud. C.R.3357. Appellees admit they had no "active role in prosecuting" *State v. Xerox* "once it was filed." *Id.* While the nature of this case is complex, this appeal asks a simple question: whether the TMFPA allows individuals who contributed no independent knowledge and did not help litigate the case to pocket tens of millions in taxpayer dollars? For the reasons below, the answer is no.

## I.  Legal background

Medicaid provides medical care to indigent individuals. *Bell v. Low Income Women of Texas*, 95 S.W.3d 253, 255-56 (Tex. 2002). Federal and state governments jointly fund it. 42 U.S.C. § 1396. Texas enacted the TMFPA in 1995 to combat Medicaid fraud. When pursuing TMFPA enforcement, the State acts "in its sovereign capacity and exercis[es] its police powers." *Nazari v. State*, 497 S.W.3d 169, 181 (Tex. App.—Austin 2016), aff'd, 561 S.W.3d 495 (Tex. 2018); *see also In re Xerox Corp.*, 555 S.W.3d 518, 525 (Tex. 2018) (describing TMFPA actions as "state enforcement action[s]").

Texas added *qui tam* provisions to the TMFPA in 1997. Private parties (relators) can file sealed actions in the State's name. Tex. Hum. Res. Code §§ 36.101–.117. The State remains the real party in interest with ultimate control. *Id.*

Two key provisions limit *qui tam* actions:

**First-to-file bar:** No "person other than the state" may "intervene or bring a related action based on the facts underlying" a filed TMFPA suit. *Id.* § 36.106.

**Public-disclosure bar:** Relators cannot bring actions "based on the public disclosure of allegations or transactions" from the news media, hearings, audits, or investigations. *Id.* § 36.113(b) (West 2011).

After relators file under seal, the State may intervene or decline. Tex. Hum. Res. Code § 36.104(a). If the State intervenes, it has "primary responsibility for prosecuting" and can dismiss or settle over relator objections. *Id.* § 36.107. The State may also "pursue the state's claim through any alternate remedy." Tex. Hum. Res. Code § 36.109(a). If the state pursues such an alternate remedy, then the *qui tam* relator has "the same rights in the other proceeding" that they "would have had if the action had continued under" the relator's lawsuit but does not confer any additional rights. Tex. Hum. Res. Code § 36.109(a). Legitimate relators may share in recoveries. Tex. Hum. Res. Code § 36.110(a)–(b) (West 2011). The amount a relator may receive depends on whether the State intervenes, *see* Tex. Hum. Res. Code § 36.110 (2011), but in any event, courts may not award more than seven percent of the proceeds when the relator's *qui tam* is "based primarily on disclosures" from public sources. Tex. Hum. Res. Code § 36.110(b) (West 2011) (statute amended to an award of no more than 10 percent after Appellees filed suit).

## II.    Factual Background

### A.    The State's investigation of Xerox (2010–2011).

Texas Medicaid requires dental providers obtain prior authorization of orthodontic treatment plans before it will reimburse claims. C.R.6736. In 2010, a dental provider alerted the Texas Health and Human Services Commission

5

(HHSC) that Xerox was approving prior authorization requests for orthodontic services that did not meet Texas Medicaid criteria. C.R.4481. HHSC investigated:

- **January 2011**: HHSC formally notified Xerox of performance issues with Xerox's review of prior authorization of orthodontic requests. C.R.1161–62.

- **May 2011**: HHSC issued an "Oral Notice of Deficiency with Corrective Action Plan—Orthodontia Prior Authorization" to Xerox. This notice demanded that Xerox submit a detailed Corrective Action Plan addressing Xerox's review of orthodontia prior authorization issues. C.R.1164–66.

- **July 2011**: The federal Department of Health and Human Services Office of Inspector General began an audit that focused on Texas Medicaid's orthodontic benefit. The audit ultimately demanded that Texas reimburse the federal government more than $133 million for unallowable orthodontic services. C.R.4482; 4546–49.

- **August 2011**: HHSC announced actions the State had taken to "strengthen the authorization process for braces," and indicated an intent to pursue recovery of funds from both Xerox and dental providers and refer any suspected fraud to the Office of the Attorney General. C.R.4507–08.

- **October 2011**: HHSC required that Xerox hire a team of qualified, licensed dental professionals to review all orthodontic prior authorization requests. C.R.1202; 1208–09.

- **January 2012**: HHSC Executive Commissioner Thomas Suehs, State Medicaid Director Billy Millwee, and the Office of the Texas Attorney General ("OAG") Deputy Director of Law Enforcement David Maxwell all testified before the House Public Health Committee about the State's investigations of Xerox's review of Medicaid orthodontic services C.R.4554.

6

**B.     Media Investigation (2011–2012).**

In May 2011, while HHSC was investigating Xerox's administration of the Medicaid orthodontic prior authorization review a reporter with a Dallas news station, WFAA, began airing a series exposing fraud, waste, and abuse in Texas Medicaid's orthodontic program. *See, e.g.*, C.R.4543-44; 5197. Among other things, the series exposed that: Texas Medicaid had experienced a recent dramatic rise in spending on braces; Xerox performed no clinical review on orthodontic prior authorization requests; and Xerox used employees without a dental background to evaluate orthodontic prior authorization requests. *Id.* WFAA repeatedly aired similar stories between May 2011 and April 2012. *See, e.g.*, C.R.5197, 4546-49,4550-52.

**C.     *Qui tam* actions naming Xerox (2012).**

Months after public scrutiny began, sixteen individuals filed *qui tam* actions that named both Xerox as well as hundreds of dental providers that were submitting fraudulent claims to Texas Medicaid. C.R.2604. As relevant here, Appellee Alvarez filed February 28, 2012. C.R.3904-26. Appellee LaFountain filed March 19, 2012. C.R.3999-4023. Appellee Ellis filed April 24, 2012. C.R.4105-4228. The Appellees named over 200 orthodontists and dental groups in their petitions. C.R.3904-26, 3999-4023, 4105-4228. The State intervened in Appellees' *qui tam* actions with

7

respect to the orthodontists and dental groups, but not with respect to Xerox. C.R.3845.

### D. *State v. Xerox* (2014).

After years of investigation, in May 2014, the State sued Xerox for violations of the TMFPA, contending that Xerox misrepresented its review processes and used unqualified personnel, causing hundreds of millions of dollars in overpayments. C.R.4414-36. For each orthodontic claim, Xerox was required to review a submitted treatment plan, a Handicapping Labio-Lingual Deviation score sheet ("HLD sheet"), and clinical documentation supporting medical necessity including facial and intraoral photographs and radiographs. C.R.4418. The State alleged that instead of reviewing the treatment plan and reviewing the clinical documentation, Xerox approved every claim having an HLD sheet score over 26 without verifying whether that score was accurate. C.R.4416-17, 4420. Ultimately, litigation settled, and Xerox paid the State $236 million. C.R.34.

## III. Appellees' Motion for Relators' Share

Appellees were not involved in the litigation until they, along with five other *qui tam* relators, filed a Joint Motion seeking 20% of the settlement proceeds. CR. 8–22. The *qui tam* relators entered into a sharing agreement with respect to the relators share award (R.R.Vol.5.15:5—16) and the five other movants nonsuited in December

2021. C.R.3695, fn 1. In 2019, the trial court severed Appellees' claims to a relators' share from *State v. Xerox* into a new matter, which is now the subject of this appeal. C.R.838–89.

Following the severance of Appellees' Motion, the State filed a plea to the jurisdiction, challenging the district court's jurisdiction over Appellees LaFountain's and Ellis's requests for a relator's share based on the first-to-file bar. C.R.2575–622. The trial court denied the plea, and the Third Court of Appeals affirmed. C.R.3340; *State v. Ellis*, 681 S.W.3d 501 (Tex. App.—Austin 2023, no pet.).

After remand, Appellees filed a Renewed Motion on June 4, 2024, reducing their demand to 17.5% of the settlement proceeds. C.R.3348–58. The State filed Special Exceptions, C.R.3527–36, contending that Appellees failed to plead a valid cause of action, which the trial court denied. C.R.3752. The trial court ultimately awarded Appellees 17.5% of the proceeds from the State's settlement with Xerox along with pre-and post-judgment interest. C.R.9534.

## SUMMARY OF THE ARGUMENT

This Court should reverse the trial court's judgment for at least five reasons.

*First*, Appellees do not state a cognizable cause of action sufficient to waive sovereign immunity. The TMFPA expressly does *not* waive sovereign immunity, *see*

9

Tex. Hum. Res. Code § 36.116, and as a result, the trial court lacked jurisdiction.

*Second*, their claims are barred by the public disclosure bar. By the time Appellees filed, Xerox's misconduct was already publicly revealed through news reports, audits, hearings, and investigations, and Appellees do not satisfy the original source exception.

*Third*, Appellees LaFountain's and Ellis's claims are barred by the first-to-file rule because they filed their *qui tam* suits after Appellee Alvarez, and they were all based on the same facts. Tex. Hum. Res. Code § 36.106.

*Fourth*, the trial court erred by awarding prejudgment and post judgment interest against the State, because the TMFPA does not authorize such awards.

*Fifth*, even if eligible, Appellees are entitled to no more than seven percent of the settlement. Tex. Hum. Res. Code § 36.110(b) (2011). Their lack of material contribution and failure to assist the State's litigation should reduce their share to zero.

This Court should reverse and either dismiss the underlying action, or render judgment that Appellees are not entitled to a relator's share.

## STANDARD OF REVIEW

These issues relate to statutory construction and therefore are reviewed *de novo. See Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (footnote

omitted). Legal issues are reviewed *de novo*. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020) (citing *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996) ("We review questions of law without deference to a lower court's conclusion."))

<strong>ARGUMENT</strong>

## I. Appellees Have Not Pled a Valid Cause of Action Sufficient to Waive Sovereign Immunity.

The Texas Supreme Court recently reiterated that, under Texas law, the "duty of candor to the court and the duties of officers of the court" obliges Texas Lawyers to "identify even arguable jurisdictional obstacles." *In re Dallas County*, 697 S.W.3d 142, 153 (Tex. 2024) (orig. proceeding). In compliance with that duty—and recognizing that the Third Court of Appeals previously affirmed the trial court's conclusion that sovereign immunity did not preclude the trial court from adjudicating the merits of Appellees' request for a relators' share—the State raises an issue that likely prevents this Court from reaching the merits of this case: Appellees' Joint Motion for Determination of Relators' Share does not state a cause of action and is barred by sovereign immunity. *See State v. Ellis*, 681 S.W.3d 501, 513 (Tex. App.—Austin 2023, no pet.).

### A. There is No Cause of Action.

Appellees' Motion was severed from *State v. Xerox*, No. D-1-GV-14-000581 (53rd Judicial District Court, Travis County, Texas). When a case is severed, the

11

severed action must consist of a valid, independent cause of action. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990). Appellees rely on the TMFPA's alternate remedy provision to support their claim for a relators' share. C.R.7679. That provision gives relators the "same rights in the other proceedings as the person would have if the action had continued under this subchapter." Tex. Hum. Res. Code § 36.109(a). But this provision contains no standalone cause of action. The TMFPA only creates four causes of action. First, a cause of action allowing the Texas Attorney General to seek injunctive relief for violation—or threatened violation—of section 36.002. Tex. Hum. Res. Code § 36.051. Second, a cause of action allowing the Attorney General to seek civil remedies and penalties for violation of section 36.002. *Id.* § 36.052. Third, a cause of action authorizing "[a] person [to] bring a civil action for a violation of [s]ection 36.002 for the person and the state." *Id.* § 36.101. And fourth, a relator's private cause of action for retaliation. *Id.* § 36.115. The TMFPA contains no cause of action authorizing a relator to sue the State to recover a relator's share. Accordingly, Appellees have no cause of action on which to base their claims.

### B. There is No Clear and Unambiguous Waiver of Sovereign Immunity.

Even if there were a cause of action, there is no clear and unambiguous waiver of sovereign immunity. A suit against the State is barred by sovereign immunity

absent clear and unambiguous legislative consent, and sovereign immunity deprives a trial court of subject matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224–25 (Tex. 2004); *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999). When a lawsuit is barred by sovereign immunity, the trial court lacks subject matter jurisdiction, and dismissal with prejudice is proper. *Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 734 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (citing *City of Austin v. L.S. Ranch, Ltd.*, 970 S.W.2d 750, 752 (Tex. App.— Austin 1998, no pet.).

Appellees are required to affirmatively demonstrate the court's jurisdiction to hear the lawsuit under some statute that waives sovereign immunity. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001). To avoid dismissal based on sovereign immunity, a plaintiff must demonstrate either a valid Congressional abrogation of that immunity or a waiver of immunity by the state. *Univ. of Tex. at El Paso v. Herrera*, 322 S.W.3d 192, 195 (Tex. 2010). "It is settled in Texas that for the Legislature to waive the State's sovereign immunity, a statute or resolution must contain a clear and unambiguous expression of the Legislature's waiver of immunity." *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003).

Appellees cannot affirmatively demonstrate jurisdiction because they have not asserted a claim for which there is a valid waiver of immunity such that they can

maintain their suit against the State. *See, e.g.*, *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). The TMFPA stipulates that "Except as provided by Section 36.112, this subchapter does not waive sovereign immunity." Tex. Hum. Res. Code § 36.116. While Appellees rely on the TMFPA's alternate remedy provision, Tex. Hum. Res. Code § 36.109, that provision does not provide a cause of action, nor waive sovereign immunity such that putative relators can seek relators' shares in a standalone action. Even if this were a close call, the Texas Supreme Court "resolve[s] ambiguities by retaining immunity." *Wichita Falls State Hosp.*, 106 S.W.3d at 697.

Even if the alternate remedy provision waived sovereign immunity, by its plain language, it only waives immunity to the extent of the Appellees' rights in the original proceedings. *See* Tex. Hum. Res. Code § 36.109(a); *see also Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 637 (Tex. 2012) (holding that Chapter 21 of the Labor Code "waives immunity from suit only when the plaintiff actually states a claim for conduct that would violate the TCHRA"). As detailed below, Appellees' claims are barred by the public disclosure and first-to-file bars. Accordingly, there is no waiver of the State's sovereign immunity.

Moreover, in the False Claims Act context, federal courts have held that the alternate remedy provision does not confer a relator with the unfettered right to a

determination of the relator's share within the alternative proceeding. *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999) (FCA provision "does not confer any rights on would-be intervenors" but "simply preserves the rights of the original *qui tam* plaintiffs when the government resorts to an alternate remedy in place of the original action."); *United States v. Wegeler*, 941 F.3d 665, 672 (3d Cir. 2019) ("[T]he FCA does not provide a right to intervene to recover a share of the proceeds derived from a proceeding that the government pursues under the alternate-remedy provision."); *United States v. L-3 Communications EOTech, Inc.*, 921 F.3d 11, 30 (2d Cir. 2019) (even though relator voluntarily dismissed his original *qui tam* action, the FCA alternative remedy provision "does not entitle him to share in the government's recovery in its own subsequent proceeding").

Since the alternate remedy provision neither creates a cause of action nor waives sovereign immunity, Appellees' requests for relief must be denied.

## II. The TMFPA's Public Disclosure Bar Prohibits Appellees' Claims Since Their *Qui Tam* Actions Were Based on Earlier Public Disclosures.

Appellees should receive no share of the *State v. Xerox* settlement because their allegations are the same as the allegations which were already publicly disclosed by the news media, legislative reports, hearings, audits, and investigations before they filed their *qui tam* actions. *See* Tex. Hum. Res. Code § 36.113(b) (2011). Prior to Appellees filing their *qui tam* actions in 2012, both the State and a Dallas news

station, WFAA, began their investigations into Xerox's conduct. C.R.4543–44, 4507–08. Furthermore, there were at least eleven public disclosures of Xerox's conduct beginning in June 2011 through January 2012, all of which predated the filing of Appellees' *qui tam* actions in February, March, and April of 2012. *See* C.R.3904-26, 3999-4023, 4105-4228. The eleven public disclosures collectively reveal and put the State on notice of Xerox's Medicaid fraud scheme.

## A. Xerox's Fraud Was Publicly Disclosed Before Appellees Filed Their *Qui Tam* Petitions.

The TMFPA's public disclosure bar provides, in part:

> A person **may not bring** an action under this subchapter that is based on the public disclosure of allegations or transactions in a criminal or civil hearing in which the state or an agent of the state is a party, in a legislative or administrative report, hearing, audit, or investigation, or from the news media, . . ."

Tex. Hum. Res. Code § 36.113(b) (2011) (bold added). This public disclosure bar is prohibitive. *Compare id., with* Tex. Gov't Code § 311.016(5).

The public disclosures described the same scheme that the Appellees' petitions did, that Xerox was not properly reviewing prior authorization requests, and as a result, Texas Medicaid was paying millions of dollars in orthodontic claims that should have been denied. As shown in Argument section II.B.2, *supra*, none of the Appellees were original sources, so they "may not bring" their claims under Tex. Hum. Res. Code § 36.113(b) (2011).

The public disclosure bar prevents undeserving individuals from obtaining a relators' share when their *qui tam* allegations were publicly known. Analyzing textually similar public disclosure bar language in the FCA, the Fifth Circuit recognized that the purpose of the FCA bar was to "prevent rewarding 'parasitic' suits which 'add nothing to the exposure of fraud.'" *United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 272 (5th Cir. 2021) (citations omitted). Federal courts "generally apply a three-part test to determine whether the public-disclosure bar precludes an otherwise valid FCA claim." *E.g.*, *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 823 (6th Cir. 2021); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 173–74 (5th Cir. 2004). The first two parts are often combined to analyze the public disclosure bar because "combining the first two steps can be useful, because it allows the scope of the relator's action in step two to define the 'allegations or transactions' that must be publicly disclosed in step one." *See United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 327 (5th Cir. 2011).

Combining the first two parts of the test, courts first assess whether there are "any public disclosures from which fraud might be inferred." *Rahimi,* 3 F.4th at 823 (citing *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 522 (6th Cir. 2020)), and, if the answer is yes, then courts assess "how closely related the allegations in

the complaint are to those in the public disclosures." *Id.* The public disclosures must be "**sufficient** to put the government on notice," and courts look for "any public disclosures from which fraud might be inferred" which were "before the filing of the *qui tam* complaint." *Rahimi*, 3 F.4th at 823 (citation omitted) (bold added). The *Rahimi* court instructed that:

> [A] a statement or allegation satisfies the inference-of-fraud element if "the information **is sufficient to** put the government on notice of the likelihood of related fraudulent activity." *Id.* [*United States ex. rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 512 (6th Cir. 2008)] (citation and internal quotation marks omitted). In other words, the "publicly disclosed documents need not use the word 'fraud,' but need merely to disclose information which creates 'an inference of impropriety.'"

*Rahimi*, 3 F.4th at 823 (bold added) (citing *United States ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717, 724 (6th Cir. 1999). The publicly disclosed information does not have to mirror the information in the *qui tam* petition; the public disclosure bar does not require "that the public disclosure matches *with specificity* the allegations made by a *qui tam* relator." *United States ex rel. Black v. Health & Hosp. Corp. of Marion Cnty.*, 494 F. App'x 285, 294 (4th Cir. 2012).

A single public disclosure does not have to contain all the allegations of fraud, if "multiple sources of information reveal the allegation of fraud and its essential elements." *Rahimi*, 3 F.4th at 824; *see also United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 209 (1st Cir. 2016) (where an "Attorney General's

press release, parroted in the subsequent news articles, made manifest" a public disclosure). "[T]he public disclosure bar contains no requirement that a public disclosure use magic words or specifically label disclosed conduct as fraudulent." *Winkelman*, 827 F.3d at 209 (citations omitted); *see also United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 844 (6th Cir. 2020) ("Although a report need not use the word 'fraud' to qualify as a disclosure, it still must carry an inference of wrongdoing.").

Allegations or transactions which are publicly disclosed "do not have to be exactly what Relators[] allege." *Dingle v. Bioport Corp.*, 388 F.3d 209, 214 (6th Cir. 2004) (citation omitted); *see also Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451 (5th Cir. 1995) (holding "an FCA *qui tam* action *even partly based upon* publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transaction.") (citations omitted). Courts "presume that the government is on notice of particular frauds once a general disclosure of fraud has been made." *Holloway*, 960 F.3d at 848 (citations omitted). Because of this presumption, "relators cannot avoid the public-disclosure bar 'by focusing [their] allegations . . . on sub-classes of potential claims covered by the initial [disclosure].'" *Holloway*, 960 F.3d at 848 (citing *United States ex rel. Advocates for Basic Legal Equality, Inc. v. United States Bank, N.A.*, 816 F.3d 428, 432 (6th Cir.

2016)). Additionally, "[i]t is not enough to allege new, slightly different, or more detailed factual allegations." *Holloway*, 960 F.3d at 848 (citing *Dingle*, 388 F.3d at 215; *Poteet*, 552 F.3d at 514).

### 1. There were at least eleven earlier public disclosures that disclosed Xerox's fraudulent conduct.

The relevant pre-suit public disclosures inferring Medicaid fraud by Xerox were reports "from the news media," "legislative reports," and "hearings, audits, or investigations." The public disclosures included, for example, the following eleven disclosures:

### (a) May 13, 2011: WFAA article.

This article kicked off WFAA's reporting on Xerox's fraud and explained that Medicaid dental claims were getting approved without being properly reviewed. "Critics say the state simply doesn't evaluate [Texas Medicaid orthodontic] claims." C.R.4543–44. It quoted a Baylor Dental School professor: "There's no checks and balances … There's no legitimate approval process." *Id.* Referring to Xerox subsidiary ACS[1] the article reported that "Medicaid claims are processed by an outside contractor in Texas." *Id.* It also reported that HHSC "is aware of a potential problem" and quoted an HHSC spokesperson who said "Dentistry is an

---

[1] Affiliated Computer Services ("ACS") was Xerox's wholly owned subsidiary responsible for approving Texas Medicaid orthodontic claims. C.R.6733.

area we've been concerned about for a long time . . . And for whatever reason, we've had more trouble than in other parts of Medicaid." *Id.*

### (b)    June 19, 2011: WFAA broadcast.

This broadcast reported that children under 12 did not qualify for orthodontic care except in limited circumstances. Ex. G-1, C.R.5197. "Orthodontic services are limited to the treatment of children who are 12 years of age and older according to the Texas Medicaid Provider Manual." *Id.* at 1:00 – 1:09. "[T]here are special cases where kids under 12 can get orthodontic treatment under Medicaid." *Id.* at 1:40 – 1:45. A Baylor Dental School dentist explained that the ACS Dental Director "has to personally approve that case." *Id.* at 1:46 – 1:53. Despite these restrictions, an extremely large number of children under 12 years of age were approved for orthodontic care. "[T]wenty-four percent of the braces put on kids in Texas last year were on children under 12" *Id.* at 1:30 – 1:37. "[N]early 19,000 children got that special approval from the state last year." *Id.* at 1:53 – 2:00. Texas State Senator Jane Nelson was interviewed and said, "clearly these are thousands and thousands of children who are getting braces . . . not because of a health-related reason." *Id.* at 2:00–2:10. "Clearly we need to … see if there are certain companies or individuals that are not being totally honest about what they're doing." *Id.* at 2:22–2:33.

### (c) July 5, 2011: Letter from the U.S. Department of Health and Human Services to Texas HHSC Executive Commissioner.

This letter announced that the U.S. Department of Health and Human Services had become aware that Texas Medicaid was paying for a suspiciously large number of orthodontic claims and decided to conduct "an audit of the Texas Medicaid prior authorization process for orthodontic treatment" with the objective to "review the State's controls to ensure that only medically necessary orthodontic cases are paid." C.R.4482–83. This announced audit was to be conducted "with help" from Texas's HHSC-OIG. *Id.*

### (d) August 25, 2011: WFAA website article.

This article summarized WFAA's investigation to date, as well as provided new information. C.R.4546–49. "For the past six months, News 8 investigators have revealed hundreds of millions of dollars of questionable Medicaid spending on braces for children in Texas." *Id.* It reported that "federal investigators are auditing the" Texas HHSC, "which controls those funds," and that the audit "will examine the 'authorization process for orthodontic treatment' under Texas Medicaid." *Id.* It explained that "[o]rthodontic treatments are authorized by ACS, a private contractor in Austin." *Id.* It interviewed the HHSC Commissioner who "'didn't know' if it was physically possible for" the ACS dental director "to personally

22

approve" applications for "the 18,898 children under 12 who were approved for [Texas Medicaid orthodontic] treatment last year." *Id.* The HHSC Commissioner "said if taxpayers money had been lost, the attorney general might take action to get it back." C.R.4546–49.

### (e)    August 30, 2011: HHSC news release.

This news release reported that HHSC was aware of Xerox's conduct and was taking steps to address it. C.R.4507–08. "The contractor responsible for approving requests for orthodontic services [Xerox] has been directed to develop a corrective action plan to ensure that existing state policies are followed." *Id.* The State had "begun pulling hundreds of cases to review the contractor's approval process for braces." *Id.* Texas HHSC's "Office of Inspector General" was "continuing its review of the authorization process for orthodontic services." *Id.* The State "will sample new cases each quarter to review the work of each staff member processing requests for services." *Id.* "If the reviews find the contractor approved services that don't meet the state criteria … HHSC will recover those costs from the contractor." *Id.* "Any cases of suspected fraud will be referred to the Office of the Attorney General." *Id.*

**(f)    September 1, 2011: Columbia Journalism Review article.**

This article reported that some of the kids who received braces under Texas Medicaid "may not have met the state's criteria for orthodontic work." C.R.4553. The article explained that ACS was not properly reviewing claims but was instead automatically approving claims that had an HLD scoresheet of twenty-six or more. *Id.* "An outside contractor processes Medicaid claims, and apparently rejects the claims only if the paperwork is incomplete—and not on the basis of medical evaluation. The contractor uses a score sheet for each case, and a score of twenty-six means a kid will get help." *Id.* The article also reported that "one orthodontist told WFAA" that "[a]ny way you fill out the sheet will be approved." C.R.4553.

**(g)    November 11, 2011: WFAA broadcast.**

This report specifically named Xerox subsidiary ACS as the Texas Medicaid contractor responsible for reviewing orthodontic claims. Ex. G-8, C.R.5197 at 1:32–2:22. It also reported that HHSC had long known of the large number of orthodontic claims being approved. "Internal memos obtained by News 8 [WFAA] under the Public Information Act show the Department of Health and Human Services became aware of millions of dollars of exceptional charges by dozens of Texas orthodontists nearly two years ago." *Id.* at 2:54–3:08. It also interviewed a former Xerox employee who said that Texans were "paying for services that shouldn't be paid for." *Id.* at

2:33–2:38. Xerox had a compensation plan called "ABC" that rewarded employees for reviewing claims quickly regardless of accuracy. "What may be behind the problem goes beyond teeth, braces and dentists. It's the way ACS pays its workers a policy called activity-based compensation, or ABC. The concept of activity-based compensation is quantity over quality. The more claims you process the more money you make." *Id.* at 3:26–3:47. "But for workers the message is clear: rush the claims through whether they're correct or not." *Id.* at 4:10–4:17.

### (h) December 16, 2011: WFAA broadcast.

This broadcast reported that the Texas Senate would conduct a hearing in January 2012, to address the issue of Medicaid orthodontic claim review. Ex. G-9, C.R.5197. WFAA stated that its reporting played a role in the decision to hold the hearing: "[P]art of a News 8 investigation that began with braces and ended up with Affiliated Computer Services [ACS], the company which processes Medicaid dental claims, paying its workers on how many claims they process rather than how well they do the work." *Id.* at 0:51-1:08. Senator Jane Nelson was interviewed and said "I gotta tell you if there was fraud taking place somebody needs to be accountable for that, and I'm not talking about just paying the money back." *Id.* at 1:41–1:50.

### (i)    December 27, 2011: WFAA website article.

This article succinctly summarized the WFAA reporting to date. It stated that WFAA-TV had broadcast "an 11-part investigative series that reveals tens of millions of dollars in questionable billings and a troubling lack of oversight of the Texas Medicaid orthodontic program." C.R.4550–52. WFAA reporting "for example, reveal[ed] that nearly 20,000 Texas children under 12 . . . received braces last year. Medicaid is supposed to strictly limit such care . . . ." *Id.* It provided additional details about Xerox's ABC compensation plan. "[O]nly a handful of reviewers are assigned to process more than a hundred thousand orthodontic claims annually" which "leaves reviewers little time to review each of the claims" and "dental claims reviewers are paid, in part, based on the volume of claims they process." *Id.* It also detailed HHSC's plans to address the issue. "[T]he state has directed the orthodontic Medicaid contractor to develop a 'corrective action' plan" and "Texas lawmakers also have scheduled a series of hearings. If the Medicaid-approved services don't meet state criteria, possible fines and reimbursements from providers and the state contractor may be levied." *Id.*

### (j)    January 24, 2012: Texas legislative hearing.

At this hearing HHSC outlined the steps it was taking to address the issues caused by Xerox's failure to properly review orthodontic claims. The HHSC

Commissioner testified that "we probably [are] going to find as we go through this, our contractor didn't follow some of the policies and procedures they should have." Ex. C-9, C.R.4531 at 2:51:00-2:51:12. "We also, internally, I believe that as a Medicaid agency, we may have delegated review of the—of the dental policies too much that contractors [ACS] took advantage." *Id.* at 3:24:41-3:24:50.

### (k)     January 25, 2012: texaswatchdog.org article.

This article reported that the Texas Office of Attorney General was investigating Xerox for improper conduct based on its failure to properly review orthodontic claims. "The Texas Attorney General's office is investigating an attempt to build [sic.] the state's social safety net out of $185 million in dental brace materials." C.R.4554. "David Maxwell, deputy director of law enforcement for the Attorney General, disclosed the investigation during testimony before the House Public Health Committee Tuesday at the Capitol." C.R.4554.

### 2.     The Appellees' allegations were "based on" the allegations in the public disclosures.

Comparing the allegations in the public disclosures to the allegations in the Appellees' petitions shows the Appellees' allegations were "based on" the public disclosures under Tex. Hum. Res. Code § 36.113(b) (2011). The comparison below demonstrates that Appellees' *qui tam* lawsuits were "based on prior public disclosures" and "essentially the same . . . scheme was 'the primary focus of each'."

27

*Holloway*, 960 F.3d at 847 (citations omitted) (cleaned up); *see also Rahimi*, 3 F.4th at 826 (citing *Holloway*).

### a. Alvarez's allegations had been publicly disclosed.

Nearly all of the 58 paragraphs in Alvarez's petition are devoted to describing the unlawful conduct of the orthodontic company she worked for. *See* C.R.3904-26. Only 8 paragraphs include allegations against Xerox. *See* C.R.3904-26 ¶6, ¶29, ¶42, ¶49, ¶51, ¶54, ¶55, and ¶57. The claims against Xerox (ACS) include non-specific allegations which had previously been publicly revealed.

For example, with respect to Xerox, the Alvarez petition alleges that "Medicaid funds were … approved by Defendant ACS … even though the braces … were for cosmetic or aesthetic reasons[.]" C.R.3906-07, ¶6. This allegation had already been described in several public disclosures, including a June 19, 2011, WFAA report that reported that thousands of children were getting braces not because of health-related reasons (Ex. G-1, C.R.5197 at 2:00-2:10) and a September 1, 2011, Columbia Journalism Review article detailing that some kids receiving braces under Texas Medicaid may not have met the state's criteria for orthodontic work. C.R.4553.

The Alvarez petition further alleges that claims "are processed by Defendant ACS, which routinely approved claims without checking the veracity of whether or

not such claims complied with Medicaid guidelines for reimbursement." C.R.3913, ¶29; and at C.R.3919, ¶42. Similarly, it alleges that approved claims had to be "in compliance with Medicaid criteria and guidelines" yet ACS approved claims regardless. C.R.3923, ¶51; C.R.3923–24, ¶54. Allegations that Xerox did not comply with Medicaid criteria and guidelines had been publicly disclosed many times. *See* C.R.4543–44, 4482–83, 4546–49, 4507–08.

Finally, the Alvarez petition alleged that ACS negligently approved improper claims. *See* C.R.3922, ¶49 (ACS was "negligently approving False Claims"); C.R.3924, ¶55 (ACS approved "False Claims that never should have been paid!"); C.R.3924, ¶57 (requesting/demanding that "ACS be required to reimburse the State of Texas for all claims approved by ACS that were False Claims . . . ."). Once again, the fact that ACS was approving improper claims was publicly disclosed many times. For example, a June 19, 2011, WFAA broadcast disclosed that ACS was approving claims "not because of a health-related reason" (Ex. G-1, C.R.5197 at 2:00-2:10) and a November 11, 2011, WFAA broadcast reported that ACS workers were given the message to "rush the claims through whether they're correct or not." Ex. G-8, C.R.5197 at 4:10–4:17.

Alvarez's allegations could have been inferred from the public disclosures. *Rahimi*, 3 F.4th at 823. What's more, the State was already aware of these issues and was investigating them. *See* C.R.4507–08, C.R.4550–52, C.R.4554.

### b. LaFountain's allegations had been publicly disclosed.

LaFountain's allegations against Xerox mirrored Alvarez's. LaFountain's petition was composed almost entirely of allegations against LaFountain's former employer, BLT Management Company. *See* C.R.3999-4023. Only 7 paragraphs out of 64 made allegations of misconduct against Xerox (ACS). *See* C.R.3999-4023: ¶6, ¶29, ¶42 ¶54, ¶60, and ¶64. LaFountain's allegations regarding Xerox described the same scheme revealed in the public disclosures.

For example, LaFountain alleged that "Medicaid funds were . . . approved by Defendant ACS . . . and then paid which were False Claims . . . as they are not in compliance with the State of Texas Medicaid Manual and Medicaid guidelines for reimbursement." C.R.4002 ¶6; *see also* ¶54 and ¶64. The fact that ACS was approving improper claims was publicly disclosed many times. For example, a June 19, 2011, WFAA broadcast disclosed that ACS was approving claims "not because of a health-related reason" (Ex. G-1, C.R.5197 at 2:00-2:10) and a November 11, 2011, WFAA broadcast reported that ACS workers were given the message to "rush the claims through whether they're correct or not." Ex. G-8, C.R.5197 at 4:10–4:17.

LaFountain next alleged that ACS/Xerox "routinely approved claims without checking the veracity of whether or not such claims complied with Medicaid guidelines for reimbursement." C.R.4002 ¶6, C.R.4011 *see also* ¶37, ¶45, and ¶60. Allegations that Xerox did not comply with Medicaid criteria and guidelines had been previously publicly disclosed. *See* C.R.4543–44, 4482–83, 4546–49, 4507–08.

Finally, LaFountain contended that Xerox's activity-based compensation systems incentivized the approval of improper claims. C.R.4021 ¶60. "Moreover, Defendant ACS amazingly had in place an 'activity based compensation' program, meaning the people processing the claims were paid by the number of claims processed, so they had no incentive to closely analyze and reject False Claims!" *Id.* Xerox's ABC compensation plan had already been publicly disclosed, including in a November 11, 2011, WFAA broadcast (Ex. G-8, C.R.5197 at 3:26–3:47) and in a December 27, 2011, WFAA website article. C.R.4550–52.

#### c.    Ellis's allegations had been publicly disclosed.

While Alvarez's petition named 8 defendants, and LaFountain's named 17 defendants, Ellis's petition named over 220 defendants and an additional 200 John Does, one of which was "Xerox State Healthcare." C.R.4105-4228. As with the other petitions, Ellis's petition contained general information relating to Xerox's conduct. Only 23 numbered paragraphs out of 141 contain allegations of misconduct

naming Xerox/ACS. *See* C.R.4105-4228: ¶1.04, ¶4.07 ¶4.0, ¶4.14, ¶4.20, ¶4.21 ¶4.22, ¶4.23, ¶4.37, ¶5.02, ¶5.04, ¶5.10, ¶11.01, ¶11.02, ¶11.03, ¶17.02, ¶17.03, ¶17.04, ¶18.02, ¶18.03, ¶18.04, ¶19.02, and ¶19.03. All of these allegations against Xerox had been publicly disclosed.

For example, Ellis alleged that ACS "rubber stamped" or "green lighted" providers' dental services preapproval requests. C.R.4105-4228: ¶1.04, ¶4.08, ¶4.23, ¶5.02, ¶5.10, and ¶11.01. There were numerous public disclosures alleging that Xerox approved claims without properly reviewing them first. WFAA's May 13, 2011, article reported that "there's no legitimate approval process." C.R.4543–44. The September 1, 2011, Columbia Journalism Review article reported that children were obtaining braces they were not qualified to receive and that "[a]ny way you fill out the [application] sheet will be approved"). C.R.4553. Likewise, the November 11, 2011, WFAA broadcast reported that ACS workers were given the message to "rush the claims through whether they're correct or not." Ex. G-8, C.R.5197 at 4:10–4:17.

Ellis's petition further alleges that that Xerox (ACS) did not follow proper policies, procedures, and requirements. C.R.4105-4228: ¶1.04, ¶4.07, ¶4.14, ¶4.209, ¶4.21, ¶4.22, ¶4.23, ¶4.37, ¶5.02, ¶5.04, ¶5.10, ¶11.01, ¶11.02, ¶11.03, ¶17.02, ¶17.03, ¶17.04, ¶18.02, ¶18.03, ¶18.04, ¶19.02, and ¶19.03. Allegations that

Xerox did not follow proper Medicaid policies, procedures, and requirements had been publicly disclosed numerous times. *See* C.R.4543–44, 4482–83, 4546–49, 4507–08.

*****

Here, the "primary focus" of each of Appellees' allegations was "essentially the same" scheme as the one set out in the public disclosures. *See* C.R.4543–44, 4482–83, 4546–49, 4507–08. That is, that Xerox approved applications for Texas Medicaid orthodontic services without properly reviewing them (including claims for children under 12 years of age) and in doing so Xerox failed to follow proper policies, procedures, and requirements. *See Holloway*, 960 F.3d at 847 (holding "relator's claims are based on prior public disclosures where 'essentially the same … scheme' was the 'primary focus' of each.") Appellees' allegations were based on those public disclosures, so they are barred by Tex. Hum. Res. Code § 36.113(b) (2011).

### B.   None of the Appellees were Original Sources.

The original-source rule provides an exception to the public disclosure bar for a person who brings the action and is an original source of the information. Tex. Hum. Res. Code § 36.113(b) (2011). An "original source" is defined as person who:

> (1)   has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the

> information to the state before filing an action under this subchapter that is based on the information; or
>
> (2) has knowledge that is independent of and materially adds to the publicly disclosed allegations and who has voluntarily provided the information to the state before filing an action under this subchapter that is based on the information.

*Id.*

The original source part of the public disclosure bar analysis is "more exacting" than the public disclosure bar analysis. *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 814 (11th Cir. 2015). Assuming the first two parts of the public disclosure bar test are answered yes—which is the result here—the analysis then considers whether the relator was nonetheless "an original source of the information." *Rahimi*, 3 F.4th at 823. An original source is someone having "direct and independent knowledge" that "materially adds to the publicly disclosed allegations." Tex. Hum. Res. Code § 36.113(b) (2011). For either, the original source must also have "voluntarily provided the information to the state before filing an action . . . based on the information." *Id.*

"Direct" knowledge must be "derived from the source without interruption or gained by the relator's own efforts rather than learned second-hand through the efforts of others." *Reagan*, 384 F.3d at 177; *see also United States ex rel. Denis v. Medco Health Sols., Inc.*, 777 F. App'x 30, 33 (3d Cir. 2019) (direct knowledge "is obtained without any intervening agency, instrumentality, or influence: immediate.")

(citations omitted). While original sources do not have to be insiders, a third party cannot be "'the source of the core information' upon which the *qui tam* complaint is based." *United States ex rel. Dhawan v. N.Y. Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (citations omitted).

Appellees do not claim that Alvarez was an original source. C.R.7661-71 (arguing in the title of the section: "Even if there was a public disclosure, LaFountain and Ellis are Original Sources" without mentioning Alvarez). Appellees cannot now argue Alvarez was an original source. *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (general rule is that claims "must have been asserted in the trial court in order to be raised on appeal"); *see also Loftin v. Lee*, 341 S.W.3d 352, 356 n.11 (Tex. 2011) (citing *Dreyer*). As shown below, neither LaFountain nor Ellis pass the original source test of Tex. Hum. Res. Code 36.113(b) (2011), so this exception to the public disclosure bar does not apply.

### 1. LaFountain was not an original source.

LaFountain cannot satisfy the original source exception, because his testimony confirmed that he had no "direct and independent" knowledge of information supporting his allegations against Xerox. At his deposition, LaFountain testified that he did not "work with anyone from ACS" C.R.4844 (29:9-11); he "did not have direct interaction with ACS" C.R.4844-45 (29:2530:4); his knowledge from

his Petition of "False Claims" which were "submitted to Medicaid" was "not from direct interactions with ACS" C.R.4845-46 (30:13-31:2); he "didn't interact with anyone" at ACS "who told" him "about activity based compensation" C.R.4859 (44:19-22); his petition did not name any specific ACS employees alleged to be involved in the Medicaid fraud scheme, C.R.4868, 4876 (53:4-9, 61:17-20); and his petition was "not based on" his "direct knowledge" of personal interaction with ACS. C.R.4868, 4875-77 (53:4-9, 60:25-61-7, 61:23-62:3). LaFountain acquired his knowledge of Xerox not from his "own efforts" as required for an original source, but instead "learned second-hand through the efforts of others". *Reagan*, 384 F.3d at 177.

Furthermore, LaFountain's information was not "voluntarily provided" as required by Tex. Hum. Res. Code § 36.113(b)(1), (2) (2011). Based solely on his own testimony, LaFountain alleges he met with HHSC-OIG prior to filing his *qui tam* suit "in connection with an audit of his former employer, Bear Creek." C.R.7631. In other words, his then employer was being audited for potential Medicaid violations. LaFountain gave information in response to the audit, which his former employer was obligated to give as a Medicaid provider. Information is not "voluntarily provided" if a relator "remained silent until the government itself

36

heard of the fraud and began its own investigation." *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995). That was the case here.

Additionally, there was nothing in the record showing LaFountain's information "materially added to the public disclosures." Tex. Hum. Res. Code § 36.113(b)(1), (2) (2011). LaFountain claims that he met with HHSC-OIG in 2011 and "specifically addressed his concerns about Xerox approving Medicaid orthodontic treatment that did not qualify for reimbursement." C.R.7666. The fact that Xerox was approving orthodontic claims that did not qualify for reimbursement, however, was publicly disclosed throughout 2011. *See* C.R.4543–44, 4482–83, 4546–49, 4507–08. Without adding any additional details or specifics, nothing LaFountain allegedly told HHSC-OIG regarding Xerox's conduct "materially added" to those public disclosures. In sum, LaFountain did not have direct and independent knowledge of Xerox's conduct, any information he provided HHSC-OIG was not provided voluntarily, and there is no evidence any information he provided materially added to the public disclosures. As a result, LaFountain was not an original source.

## 2. Ellis was not an original source.

Ellis similarly does not satisfy the original source exception. Ellis testified she knew about problems with Medicaid "from conversations she'd had with colleagues" and patients. C.R.5081-82, (50:9 to 51:9); *see also* 5067-68, (64:22-65:9)

(describing a meal with colleagues before a meeting where with "the conversation that was going on" there was a "consistent theme . . . that there was a work-around to make a whole lot of money if you wanted to"). She also testified that she, likewise, learned about HLD scoresheets from talking with colleagues at Baylor. C.R.5061-62 (44:3–45:16). This knowledge was not "direct and independent." Direct knowledge cannot be "derivative of the information of others." *United States ex rel. Lam v. Tenet Healthcare Corp.*, 287 F. App'x 396, 400 (5th Cir. 2008) (citing *United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 355 (5th Cir. 2003)); *see also Prather v. AT&T, Inc.*, 847 F.3d 1097, 1104 (9th Cir. 2017) ("To have direct knowledge under the statute, a person's knowledge must be firsthand, obtained through his own labor, and unmediated by anything else.") (citation omitted).

Ellis testified that her knowledge about Texas Medicaid "approving orthodontics claims" was that "there was something that happened, and I didn't know what it was . . . . But I knew that there was something that was going on." C.R.5070 (53:3-10). When asked when she "first learn[ed] that there was no legitimate approval process," Ellis testified, "I'm trying to think how I can answer this. Because you -- because you don't have to know to know. I knew long before this that there was no legitimate approval process, because what we were seeing would not have been happening." C.R.5075 (58:19-25). That is not "direct and

independent" knowledge, as defined by the Ninth Circuit in *Prather*, which held an original source must possess "true knowledge," which is "opposed to guesswork or suspicion, since 'the purposes of the Act would not be served by allowing a relator to maintain a *qui tam* suit based on pure speculation or conjecture.'" 847 F.3d at 1104 (citations omitted).

Appellees argued that "Dr. Ellis observed the end-result of Xerox's fraud" when she treated patients "and eventually realized that they ... were exploiting Xerox's fraudulent scheme to commit fraud." C.R.7667. Ellis claims she "treated the worst cases of Medicaid orthodontic abuse from a variety of providers across the state and eventually realized that [the providers] ... were exploiting Xerox's fraudulent scheme to commit fraud of their own." C.R.7667. While this may have led her to suspect that Xerox was committing fraud, it did not provide her with first-hand knowledge of Xerox's conduct. Her observations of the results of orthodontic work rendered by other providers does not qualify her as an original source as to Xerox's approval process.

Ellis's information was not "voluntarily provided" as required by Tex. Hum. Res. Code § 36.113(b) (1), (2) (2011) because Ellis was hired by HHSC-OIG to review orthodontic claims after Xerox's fraud was publicly disclosed. C.R.8647. The Fifth Circuit held that "the fact that a relator 'was employed specifically to disclose fraud

is sufficient to render his disclosures nonvoluntary.'" *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 294 (5th Cir. 2012) (*citing United States ex rel. Fine v. Chevron, U.S.A.*, 72 F.3d 740, 744 (9th Cir. 1995) (en banc). The Ninth Circuit explained that a former Department of Energy OIG employee did not voluntarily provide information when he "was a salaried government employee, compelled to disclose fraud by the very terms of his employment." *Fine*, 72 F.3d at 743.

Here, like the employee in *Fine*, Ellis was a salaried contractor, hired by HHSC-OIG to disclose fraud. *See* C.R.8647. The contract was a "Medical/Dental Services Contractor Agreement" with HHSC-OIG defined "as described in 531.101, *et seq*, Texas Government Code." *Id.* at 1. Tex. Gov't Code § 531.102(a) stipulates that HHSC-OIG "is responsible for the prevention, detection, audit, inspection, review, and investigation of fraud, waste, and abuse in the provision and delivery of all health and human services in the state, including services through any state-administered health or human services program that is wholly or partly federally funded[.]" The contract between Ellis and HHSC-OIG related to "medical provider integrity and quality review," with the goal to "provide and implement," in part, "appellate procedures," "administrative or judicial reviews, and any and all other legal proceedings." *Id.* at 1–2. Over seven months before she filed her *qui tam* suit, Ellis was under contract with HHSC-OIG, to investigate fraud. C.R.8647. Under

*Little* and *Fine*, this meant Ellis did not provide information voluntarily and could not qualify as an original source.

Ellis named several providers in her *qui tam* petition, including Dr. Richard Malouf. *See* C.R.7668-71. The State intervened in the case against Dr. Malouf, and defended Ellis as being an original source when Dr. Malouf challenged her under the public disclosure bar. *Id.* Appellees, however, wrongly conflate Ellis's original source status in the *Malouf* case with her original source status here. *Id.* The allegations in the *Malouf* case were entirely different from the allegations against Xerox. In *Malouf*, the State made several allegations against Dr. Malouf including that he submitted claims using his provider number for services performed by other dentists. *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712, 717 (Tex. 2024). The fact that Dr. Ellis may have been an original source with respect to the *Malouf* allegations does not confer original source status with respect to the State's *Xerox* allegations. *See Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007).

In *Rockwell*, the U.S. Supreme Court analyzed a putative relator's argument "that his original-source status with respect to" one claim "provided jurisdiction with respect to all of his claims." *Id.* The Court disagreed, holding that the FCA's public disclosure bar "does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. We, along with every court to have

addressed the question, conclude that § 3730(e)(4) [the FCA's public disclosure bar] does not permit such claim smuggling." *Id.* (citing *Merena*, 205 F.3d 97, 102 (3d Cir. 2000); *Hays v. Hoffman*, 325 F.3d 982, 990 (8th Cir. 2003); *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1415–1416, 1420 (9th Cir. 1992)). The *Rockwell* Court cited *Merena*, where "then-Judge Alito explained, '[t]he plaintiff's decision to join all of his or her claims in a single lawsuit should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action." *Rockwell*, 549 U.S. at 476 (citing *Merena*, 205 F.3d at 102); *see also United States ex rel. Lockey v. City of Dallas*, 576 F. App'x 431, 436 n.2 (5th Cir. 2014) (holding that a putative relator's personal experiences with one party did not "support an original source determination as to the" putative relator's claims against another party. (citing *Rockwell*, 549 U.S. at 476)).

In sum, Ellis did not have direct and independent knowledge of Xerox's conduct, any information she provided the State was not provided voluntarily, and her status as an original source in the *Malouf* case has no bearing on this case. As a result, Ellis was not an original source.

\*\*\*

Because there were public disclosures of Xerox's fraudulent scheme before Appellees brought their *qui tam* suits, and because LaFountain and Ellis are not

original sources, Appellees' claims are barred and must be dismissed under the TMFPA's public disclosure bar.

## III. LaFountain and Ellis are Barred by the TMFPA'S First-to-File Provision.

Because Alvarez filed her *qui tam* petition first alleging the same underlying facts as to Xerox, LaFountain's and Ellis's later-filed actions are barred by the TMFPA's first-to-file provision and must be dismissed.

### A. The First-to-File Bar Prohibits Later Filed *Qui Tam* Actions That Allege the Same Underlying Facts.

The TMFPA prohibits "[a] person other than the state" from "interven[ing] or bring[ing] a related action based on the facts underlying a pending action brought under this subchapter." Tex. Hum. Res. Code § 36.106. The first-to-file bar's language is prohibitive— **"may not** intervene or bring."[2]

Appellees have taken the position that currently three (previously eight[3]) *qui tam* relators are all the **first** to file their petitions against Xerox. C.R.7676. The TMFPA, however, "contemplates a fact-intensive inquiry by the trial court to

---

[2]    *See* Code Construction Act, Sec. 311.016(5) ("'May not' imposes a prohibition and is synonymous with 'shall not.'"). Since section 36.106 uses "may not" and is prohibitive, whether or not this provision is jurisdictional is somewhat academic in this appeal. *See Stein v. Kaiser Found. Health Plan, Inc.*, No. 22-15862, 2024 WL 4784915, at *1 (9th Cir. Nov. 14, 2024) (mem. op.) (dismissing an FCA claim on first-to-file bar grounds while recognizing, on remand, that the first-to-file bar is not jurisdictional). Under the plain language of section 36.106 Appellees "may not" bring their actions if they are not first-to-file.

[3] *See* C.R.8. *Joint Motion*, with, at the time of filing, eight *qui tam* relators all of whom had to be first-to-file as to Xerox, or they **may not** bring their actions under TMFPA § 36.106.

determine whether the [first-to-file and public disclosure] bars apply. *See* Tex. Hum. Res. Code § 36.106 (requiring factual determination of whether allegations were based on facts underlying pending action), .113(b) (requiring factual determination of whether allegations were already publicly disclosed)." *State v. Ellis*, 681 S.W.3d at 514 (citing *United States v. Millenium Labs., Inc.*, 923 F.3d 240, 253 (1st Cir. 2019) (where the court "proceed[ed] claim-by-claim" to determine if the FCA's first-to-file bar, 3730(b)(5), applied) (citation omitted); *Merena*, 205 F.3d at 102 (holding a "court must conduct a claim-by-claim analysis in order to determine if" the first-to-file bar applies.))

As the Third Court of Appeals held: "If the newly filed complaint 'alleges the same material or essential elements of fraud described in a pending *qui tam* action,' the first-to-file bar applies." *State v. Ellis*, 681 S.W.3d at 505–06 (citing *In re Gilead Scis., Inc.*, No. 06-21-00030-CV, 2021 WL 4466006, at *2 (Tex. App.—Texarkana Sept. 30, 2021, orig. proceeding) (mem. op.); *Millenium Labs.*, 923 F.3d at 252–53; *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 377-78 (5th Cir. 2009); *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 116 (D.C. Cir. 2015) (applying the analogous the FCA first-to-file bar). Relators "cannot avoid" the FCA's "first-to-file bar by simply adding factual details[.]" *United States v. Planned Parenthood of Houston*, 570 F. App'x. 386, 390 (5th Cir. 2014) (citing *Branch*,

560 F.3d at 378). This is because a "relator who merely adds details to a previously exposed fraud does not help 'reduce fraud or return funds to the federal fisc,' because 'once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds.'" *Branch*, 560 F.3d at 378. (citations omitted).

**B.      LaFountain Alleged the Same Underlying Facts of Xerox's Fraud as Alvarez.**

LaFountain alleged the same scheme as Alvarez—that Xerox approved orthodontic claims that were not in compliance with Medicaid guidelines for reimbursement (C.R.4002 ¶6; ¶54 ¶64) and that Xerox routinely approved claims without reviewing them. C.R.4002 ¶6, C.R.4011 ¶37, ¶45, and ¶60. Alvarez made the exact same allegations in her petition *See* C.R.3906-07, ¶6, C.R.3913, ¶29; and at C.R.3919, ¶42.

LaFountain even acknowledged that his petition used "pretty much the same" language as Alvarez's. C.R.4925-26, *LaFountain Depo.* (110:2–111:9). LaFountain admitted that language in his paragraph 54 "looks like it's virtually cut-and-paste" of the language in Alvarez's petition's paragraph 49 (*Id*. at 102:4-104:1) and that his petition's paragraph 57 looks identical to language in Alvarez's petition's paragraph 50. *Id*. at 104:22-105:3.

LaFountain's petition mentions activity-based compensation in his petition, but Alvarez had already disclosed that fact in a disclosure letter sent to the State around the time her Petition was filed. *See* C.R.3941. This letter read, in part:

> [T]he submission of Medicaid claims for approval to ACS was nothing more than a "rubber stamp" approval. This is partly because ACS had and has an "activity based compensation" compensation [sic.] plan. In short, under this "plan" its workers got paid in part based upon the
>
> number of claims processed. Thus there has been no incentive for years for ACS employees to detect Medicaid fraud!

*Id.* Moreover, as discussed in Argument section I.A., supra, ABC had already been publicly disclosed before LaFountain filed his petition. *See, e.g.*, C.R. 5197 at 3:26-31 ("What may be behind the problem goes beyond teeth, braces and dentists. It′s the way ACS pays its workers a policy called activity-based compensation, or ABC.")

Even if activity-based compensation had not already been disclosed, it would not overcome the first-to-file bar. The ABC program, which incentivizes speedy review of claims, is not fraudulent in and of itself, it is merely a factual detail that adds to the essential element of fraud – that Xerox employees were not following Medicaid guidelines and were not properly reviewing claims. LaFountain "cannot avoid" the TMFPA's first-to-file bar "by simply adding factual details . . . to the essential or material elements of a fraud claim against the same defendant described in a prior complaint." *Branch*, 560 F.3d at 378; *see also Heath*, 791 F.3d at 116 (holding

actions are still "related" even if they "incorporate somewhat different details") (citations omitted).

### C. Ellis Alleged the Same Underlying Facts of Xerox's Fraud as Alvarez and LaFountain.

Ellis's petition alleged the same fraudulent scheme against Xerox that LaFountain and Ellis did. Ellis alleged that Xerox "rubber stamped" or "green lighted" providers' dental services preapproval requests. C.R.4105-4228: ¶1.04, ¶4.08, ¶4.23, ¶5.02, ¶5.10, and ¶11.01. She also alleged that that Xerox did not follow proper policies, procedures, and requirements. C.R.4105-4228: ¶1.04, ¶4.07, ¶4.14, ¶4.209, ¶4.21, ¶4.22, ¶4.23, ¶4.37, ¶5.02, ¶5.04, ¶5.10, ¶11.01, ¶11.02, ¶11.03, ¶17.02, ¶17.03, ¶17.04, ¶18.02, ¶18.03, ¶18.04, ¶19.02, and ¶19.03. These same allegations were made by Alvarez. *See* C.R.3906-07, ¶6, C.R.3913, ¶29; and at C.R.3919, ¶42. These allegations were also made by LaFountain, whose petition likewise predates and bars Ellis's petition. C.R.4002 ¶6; ¶54 ¶64, ¶6, C.R.4011 ¶37, ¶45, and ¶60.

While Dr. Ellis alleged the same fraudulent scheme as Alvarez and LaFountain, Appellees argue that only Ellis alleged that Xerox "failed to disclose" its fraudulent conduct to the State. C.R.7677. Appellees also argue that only Ellis's petition added the detail that children under 12 can be approved for orthodontic treatment if they have a cleft palate. *See* C.R.4201 ¶5.04; C.R.5354. These are still mere factual details

based on the very same scheme alleged in Alvarez and LaFountain's petitions with the same "material or essential elements of fraud." *See Branch*, 560 F.3d at 378. The Alvarez, LaFountain, and Ellis petitions are all "related" even though they "incorporate somewhat different details[.]" *Heath*, 791 F.3d at 116 (citations omitted). Ellis's petition was "based on" the "facts underlying" Alvarez and LaFountain's petitions and is therefore barred by the first-to-file bar. Tex. Hum. Res. Code § 36.106.

**D.     There is no Exception to the First-to-File Bar for Sharing Agreements.**

Appellees entered into a sharing agreement with respect to the relators share award (R.R.Vol.5.15:5—16) but this does not allow LaFountain or Ellis to avoid the first-to-file bar. There is no "sharing agreement" exception in the text of the TMFPA's first-to-file bar so any private sharing agreement they have is irrelevant to their status. In an instructive FCA case, three Appellees, Sanborn, McKusick, and Lovell filed their FCA cases in that order. *United States v. AthenaHealth, Inc.*, No. CV 17-12125-NMG, 2022 WL 658654 (D. Mass. Mar. 3, 2022), *aff'd sub nom. United States ex rel. Lovell v. AthenaHealth, Inc.*, 56 F.4th 152 (1st Cir. 2022). The trial court held:

> Sanborn, not McKusick and Lovell, was the first-to-file relator and, as a result, McKusick and Lovell are not entitled to fees and costs under § 3730(d)(1).… The fact that McKusick and Lovell entered into a

private agreement with Sanborn pursuant to which they were paid a portion of Sanborn's relator's share does not alter the conclusion. The relators' agreement cannot, and does not, change the fact that McKusick and Lovell were not the first-to-file relator and thus are excluded from § 3730(d)(1) ["Award to *qui tam* plaintiff"] by the first-to-file bar of subsection (b)(5).

*United States v. AthenaHealth, Inc.*, 2022 WL 658654, at *5 (citation omitted).

Denying LaFountain's and Ellis's claims under the TMFPA's first-to-file bar is supported by the TMFPA's overall statutory scheme. Like the FCA, the TMFPA, "affords the government broad authority and contemplates that the government will serve a gatekeeping function." *Id.* at 158. Accordingly, Appellees' sharing agreement cannot save LaFountain and Ellis from being barred by the first-to-file bar.

## IV. The TMFPA Does Not Authorize Awarding Interest Against the State.

Since there was no legal basis for an award of interest in this matter, the trial court's award of prejudgment and post judgment interest to the Appellees here was error, and this Court should dismiss those claims. C.R.9534 (granting a prejudgment interest award from the State to Appellees), ¶3 (granting a post judgment interest award from the State to Appellees). Appellees sought prejudgment and post judgment interest from the State based solely on principles of equity. C.R.9173-9485.

## A.  When a Statute Controls, its Remedies are Exclusive.

While "[t]here are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute[,]"[4] when a statute creates a cause of action, such as the TMFPA here, remedies are limited only to those things specifically provided for in the statute. *In re Ament*, 890 S.W.2d 39, 41 (Tex. 1994) (per curiam) ("When a creature of 'statute' is given a 'statutory' remedy, that remedy is exclusive."). Appellees cited *Cavnar* extensively as authority for their *Motion for Prejudgment Interest*, but *Cavnar* only assessed "equitable considerations" since no statute controlled the award of interest in the personal injury case before it. *Cavnar*, 696 S.W.2d at 552.

"The general rule is that when a cause of action and the remedy for its enforcement are derived not from the common law but from statute, as in this case, the statutory remedy is exclusive." *Abbott v. G.G.E.*, 463 S.W.3d 633, 651 (Tex. App.—Austin 2015, pet. denied) (citing *Ament*). As the Texas Supreme Court has held:

> [W]here the statute provides an adequate and complete legal remedy in cases . . . the statutory remedy is exclusive and must be followed, and the powers of a court of equity acting without and independent of the statute cannot be invoked. In other words, had the defendants in error

---

[4]      *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (citing *Cavnar v. Quality Control Parking, Inc., 696 S.W.2d 549, 552* (Tex. 1985), *abrogated by Johnson & Higgins*, 962 S.W.2d 507, and *holding modified by C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315 (Tex. 1994)).

not brought suit to set aside the action of the city as provided in the statute, then equity, independent of the statute, . . . could not be invoked as a remedy.

*City of Dallas v. Wright*, 36 S.W.2d 973, 974 (Tex. 1931). This general principle applies with awarding interest; it is only "[w]hen no statute controls," that "an award of pre-judgment interest is governed by equitable principles[.]"). *Patriot Contracting, LLC v. Shelter Prods. Inc.*, 650 S.W.3d 627, 659 (Tex. App.—Houston [1st Dist.] 2021, pet. denied).[5]

---

[5]Appellees cited *Patriot Contracting*, 650 S.W.3d at 659, for the holding that the "decision to award prejudgment interest falls within the court's discretion." C.R.9175. Appellees excluded the first part of the *Patriot Contracting* court's holding, in bold: "**When no statute controls**, …." *Patriot Contracting*, 650 S.W.3d at 659 (bold added). Courts do not have discretion to apply equitable principles to include an award for prejudgment or post judgment interest, especially from the State, where the governing statute does not allow it, as with § 36.110 in this matter.

**B.     The TMFPA Does Not Provide for an Interest Award Against the State to Relators in this Matter.**

Texas law does not permit an award of interest under a statutory cause of action if the statute at issue does not expressly allow interest and waive sovereign immunity. *See* Tex. Gov't Code § 311.034 ("a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language"). Section 36.110 (2011) of the TMFPA establishes the outer limits of a relator's reward, does not mention interest, and therefore does not allow for an award of prejudgment interest against the State. *Ament*, 890 S.W.2d at 41; *Abbott v. G.G.E.*, 463 S.W.3d at 651. Courts cannot allow what the TMFPA does not expressly authorize. *See State v. Nazari*, 561 S.W.3d 495, 500 (Tex. 2018) ("Nothing in the provisions of the [TMFPA] can be construed as a waiver of immunity.")

Consistent with *Nazari*, the Texas Supreme Court in *In re Xerox* refused to apply the common law concept of damages to the TMFPA. *In re Xerox*, 555 S.W.3d at 526-27, 539. The *In re Xerox* Court held that TMFPA remedies "are not damages," and "it is reasonable to conclude the Legislature did not intend to allow fraudsters to mitigate their TMFPA liability other than on the terms set forth in the Act"). *Id.* Likewise, in this matter, it is reasonable to conclude the Legislature did not intend to allow awards of interest to Relators from the State under the TMFPA.

Since interest on payments from the State to relators are omitted from Tex. Hum. Res. Code § 36.110 (2011), and from the rest of the TMFPA, the presumption is that the Legislature intended to omit these from this TMFPA section. *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014) (courts presume "the Legislature included words that it intended to include and omitted words it intended to omit"); *see also Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) ("[W]e believe every word excluded from a statute must also be presumed to have been excluded for a purpose."). The presumption that the Legislature deliberately left prejudgment interest and post judgment interest out of Tex. Hum. Res. Code § 36.110 (2011) is even stronger because prejudgment interest is available elsewhere in the TMFPA: to the State from persons who commit TMFPA unlawful acts in § 36.052(a)(2), and to relators who are victims of retaliation from employers in § 36.115(a)(2) (providing for interest on back pay).

Nowhere in the TMFPA, however, is an award of prejudgment interest available from the State. The Legislature's choice to include interest in §§ 36.052(a)(2) and 36.115(a)(2), but not in § 36.110 (2011) means the Legislature did not intend that interest be available to relators outside the employer retaliation context (in § 36.115(a)(2)). *See Synatzske*, 438 S.W.3d at 52.

**V.    At Most, Appellees are Entitled to No More Than Seven Percent of the Proceeds of the *State v. Xerox* award.**

For all the reasons detailed above, Appellees are not entitled to a relators' share. But even if they were, they are entitled to no more than seven percent of the *State v. Xerox* settlement. Under Tex. Hum. Res. Code § 36.110(b) (2011), if a court "finds that the action is based primarily on disclosures of specific information, other than information provided by the person bringing the action," the court may award "the amount the court considers appropriate but no more than 7 percent of the proceeds of the action." Tex. Hum. Res. Code § 36.110(b) (2011). The statute requires the court to "consider the significance of the information and the role of the person bringing the action in advancing the case to litigation" in determining whether to authorize an award. *Id.*

Cases addressing the analogous provision under the FCA, 31 U.S.C. § 3730(d)(1), are instructive. In *Fed. Recovery Servs.*, the Fifth Circuit noted that Congress included that provision to provide for "the case where the information has already been disclosed and the person qualifies as an 'original source' but where the essential elements of the case were provided to the government or news media by someone other than the *qui tam* plaintiff." 72 F.3d at 452. In *United States ex rel. Merena v. Smithkline Beecham Corp.*, the Eastern District of Pennsylvania held that 31 U.S.C. § 3730(d)(1) applies where there is "a prior public disclosure" from "an

otherwise properly qualified 'original source.'" 114 F. Supp. 2d 352, 361 (E.D. Pa. 2000). *Fed. Recovery Servs.* and *Merena* contradict Appellees' contention that they should receive a flat "seven percent share under Section 36.110(b)" C.R.7671. As the Third Circuit held, "a relator whose claim is subject to dismissal under section 3730(e)(4) [the FCA public disclosure bar] may not receive any share of the proceeds attributable to that claim." *Merena*, 205 F.3d at 106. According to *Fed. Recovery Seres.* and *Merena*, a relator who is barred by the public disclosure bar and found not to be an original source may not recover under 31 U.S.C. § 3730(d)(1). *Id.* Here, because Alvarez has conceded that she is not an original source, LaFountain and Ellis must establish *both* that they are original sources *and* that they can survive the first-to-file bar before Appellees may recover under Tex. Hum. Res. Code § 36.110(b) (2011).

The *Merena* court determined that the relator was entitled to an award at the top of the range from 0-10% under FCA § 3730(d)(1), because the relator played a significant role in the litigation. *Id.* at 370. By contrast, here, Appellees provided insignificant information and admittedly played no role in advancing the case to litigation. *See* C.R.3357 (Appellees admit they did not have "an active role in 'prosecuting'" *State v. Xerox* "once it was filed").

The TMFPA requires courts to consider "the significance of the information and] the role of the person bringing the action in advancing the case to litigation."

Tex. Hum. Res. Code § 36.110(b) (2011). Here, where the relator "contributed nothing of value, a zero award" is appropriate. *Merena*, 114 F. Supp. 2d at 362.

## A.    Appellees Did Not Provide Significant Information.

The information contained in Appellees' petitions was insignificant to *State v. Xerox*. The Alvarez, LaFountain, and Ellis petitions brought no new information about Xerox violating the TMFPA that the State was not already aware of through public disclosures and its own investigation. For example, in January 2011, HHSC formally notified Xerox of performance issues with Xerox's review of prior authorization of orthodontic requests. C.R.1161–62. In May 2011, HHSC demanded that Xerox submit a detailed Corrective Action Plan addressing Xerox's review of orthodontia prior authorization issues. C.R.1164–66. In July 2011, the federal Department of Health and Human Services Office of Inspector General began an audit that focused on Texas Medicaid's orthodontic benefit that ultimately led to Texas reimbursing the federal government $133 million for unallowable orthodontic services. C.R.4482; 4546–49. In August 2011, HHSC publicly announced actions the State had taken to "strengthen the authorization process for braces," and indicated an intent to pursue recovery of funds from Xerox. C.R.4507–08. In October 2011, HHSC required that Xerox hire a team of qualified, licensed dental professionals to review all orthodontic prior authorization requests. C.R.1202; 1208–09. Appellees

did not provide any information that the State did not already know through publicly available news articles or through its own investigation into Xerox's conduct.

## B. Appellees Played No Role in Advancing *State v. Xerox* to Litigation.

Appellees admit they did not advance *State v. Xerox* through litigation. C.R.3357The State had already begun its investigation and there were at least eleven public disclosures prior to Appellees' filing their *qui tam* actions.

Courts award small percentages of recoveries to Appellees who provide minor roles in advancing cases to litigation. In *United States ex rel. Burke v. St. Jude Med.*, Inc., the Maryland District Court applied the analogous FCA provision, § 3730(d)(1), to similar facts as here, and "awarded 0.5% of the recovery" to relator. No. CV 16-3611-SAG, 2021 WL 6135202, at *8 (D. Md. Dec. 29, 2021). While the *Burke* relator, much like Appellees here, claimed her information "triggered the government's investigation[,]" the court held it "cannot discern any leads contained in" relator's "[c]omplaint that were key to the Government's subsequent investigation …. but were not otherwise within the public domain." *Id*. at *7. The court found that the *Burke* relator "did not contribute any firsthand knowledge regarding" many of the issues in the matter. *Id*. at *7. The court also found that the "role of the person bringing the action in advancing the case to litigation" appeared "to have been just that: bringing the initial action." *Id*. at *8. Unlike the record here,

the court found that the *Burke* relator with her Complaint "arguably launched the Government's investigation into, and favorable settlement with, St. Jude." *Id.* The court held that "[u]nder these facts," relator was "entitled to a nominal percentage share of the settlement proceeds" and awarded a 0.5% share. *Id.* Unlike *Burke*, here the record shows that Appellees did not launch Texas's investigation (*see, e.g.,* C.R.1161–62, 1164–66, 4482, 4546–49, 4507–08, 1202, 1208–09) and they are not entitled to a relator share.

## PRAYER

For the reasons above, the State respectfully requests that this Court reverse and either dismiss the underlying action or render judgment that Appellees are not entitled to a relator's share of the *State v. Xerox* settlement.

Respectfully submitted,

Brent Webster
First Assistant Attorney General

Ralph Molina
Deputy First Assistant Attorney General

Austin Kinghorn
Deputy Attorney General for Civil Litigation

Amy Snow Hilton
Chief, Healthcare Program Enforcement Division

*/s/ Brian VanderZanden*
Brian VanderZanden
Assistant Attorney General
Texas State Bar No. 24081557
Phone: (512) 936-9929
Brian.Vanderzanden@oag.texas.gov

Office of the Attorney General
P.O. Box 12548, MC 056-1
Austin, Texas 78711-2548
Tel: (512) 750-4880
Fax: (512) 499-0712

*Counsel for Appellant State of Texas*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), because it contains less than 15,000 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

/s/ *Brian VanderZanden*
Brian VanderZanden
Assistant Attorney General

## PROOF OF SERVICE

I certify that on July 9, 2025, a copy of this **Brief for Appellant, the State of Texas,** was served via electronic filing and email on the parties or their counsel listed below.

Charles S. Siegel
Caitlyn Silhan
Waters & Kraus, LLP
3141 Hood Street, Suite 700
Dallas, Texas 75219
csiegel@waterskraus.com
csilhan@waterskraus.com

James Moriarty
Law Offices of James R. Moriarty 4119
Montrose Blvd., Suite 250
Houston, Texas 7700
jim@moriarty.com

James "Rusty" Tucker
Law Offices of James R. Tucker, P.C.
3100 Drexel Drive
Dallas, Texas 75205
rusty@rustytuckerlaw.com

/s/ *Brian VanderZanden*
Brian VanderZanden
Assistant Attorney General

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lynette Karch-Schroder on behalf of Brian VanderZanden
Bar No. 24081557
Lynette.karch-schroder@oag.texas.gov
Envelope ID: 102956486
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Appellant
Status as of 7/10/2025 8:34 AM CST

Associated Case Party: Christine Ellis

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Caitlyn Silhan | 24072879 | csilhan@waterskraus.com | 7/10/2025 8:19:47 AM | SENT |
| James Moriarty | 14459000 | jim@moriarty.com | 7/10/2025 8:19:47 AM | SENT |
| Charles S.Siegel | | csiegel@waterskraus.com | 7/10/2025 8:19:47 AM | SENT |

Associated Case Party: Alexandra Alvarez

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Tucker | 20272020 | rusty@rustytuckerlaw.com | 7/10/2025 8:19:47 AM | SENT |

Associated Case Party: Joshua LaFountain

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| James Tucker | 20272020 | rusty@rustytuckerlaw.com | 7/10/2025 8:19:47 AM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Brian Vanderzanden | | brian.vanderzanden@oag.texas.gov | 7/10/2025 8:19:47 AM | SENT |
| Jonathan Rohde | | jonathan.rohde@oag.texas.gov | 7/10/2025 8:19:47 AM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 7/10/2025 8:19:47 AM | SENT |